Rockingham, {
Nov. 2, 1909. {

## STATE *v.* BOSTON & MAINE RAILROAD.

The provisions as to rates for fares and freights contained in section 17, chapter 100, Laws 1883, were intended to establish a maximum schedule for railroads leased or united under the act, and not merely to prohibit an arbitrary or unreasonable increase in rates.

Where a statute permitting the consolidation of railroads stipulates that rates for fares and freights upon lines leased or united under the act shall not be increased, a corporation which voluntarily exercises the privilege thereby conferred is precluded from questioning the validity or reasonableness of the condition thereto annexed.

The authority granted to the railroad commissioners to institute a prosecution against a railroad company for violation or neglect of the laws of the state does not preclude the attorney-general from proceeding of his own motion whenever the public interests so require.

Where a railroad company persistently demands and receives rates in excess of those established by law, equity may assume jurisdiction and grant an injunction against future abuse of power at the suit of the attorney-general, and especially when it appears that an information in the nature of *quo warranto* is impracticable by reason of the inadequacy of its relief or the gravity of its consequences.

A delay in instituting proceedings does not preclude the state from relief by injunction against the threatened collection of illegal rates by a railroad company.

INFORMATION IN EQUITY, asking for an injunction to restrain the defendants from demanding or receiving rates in excess of the maximum rates established by law, for the transportation of freight upon and over any of the lines of railroad operated by them within the state under the authority conferred by chapter 100 of the Laws of 1883, chapter 5 of the Laws of 1889, and chapter 156 of the Public Statutes. The defendants filed a demurrer and answer, and the questions of law arising thereon were transferred by *Pike*, J., from the October term, 1908, of the superior court.

*Edwin G. Eastman*, attorney-general, for the state.

*Mitchell, Foster & Lake* and *Branch & Branch*, for the defendants.

BINGHAM, J. This is an information brought by the attorney-general in behalf of the state, in which he gives the court to understand and be informed that the defendants are a public service corporation, operating railroads by virtue of leases or unions made and sanctioned under acts of the legislature passed in 1883 and 1889, and incorporated in the Public Statutes of 1891; that the authority conferred for leasing or uniting under the first act was granted upon the condition that the rates for fares and freights on lines leased or united thereunder should not be increased over those in existence August 1, 1883; that under the second act it was conferred upon the condition that the rates in existence at the time of the passage of the act should not be increased on lines leased or united under it; that under the Public Statutes of 1891, the authority conferred was upon the condition that the rates upon and over a railroad leased under its provisions, or upon and over a railroad passing into the possession of a new corporation formed by a union of two or more corporations, should not be increased above those in existence July 24, 1889; that, adopting and acting under the provisions of said laws, the defendants have become the lessees of various lines of railways, and as such lessees

are operating 906 out of a total of 1,190 miles of railway in the state; that their system reaches every city and large town in the state and controls the transportation at all points therein, except a few north of the White Mountains; that by leasing and uniting under the authority conferred by said laws, the defendants accepted the conditions thereof as to maximum rates which it might charge for fares and freights on all lines so leased or united and now operated by them; that, notwithstanding the conditions and limitations imposed by said acts and accepted by the defendants, they have unlawfully increased the rates for freight on all the lines leased or united under each of said acts, beyond the maximum charges therein authorized, and since 1903 have unlawfully demanded and received, and now unlawfully demand and receive, from citizens of New Hampshire and the public generally, upon all commodities transported over their leased or united lines, rates for freight in excess of the rates authorized and established by law, to the great damage of the state, of all its citizens, and of the people generally within the state. The information concludes with the following prayers (1) That the defendants be required to answer forthwith; (2) that certain freight schedules be filed; (3) that hearings be had without delay; (4) that the defendants, their servants and agents, be strictly enjoined and commanded not to demand, receive, or collect from citizens of New Hampshire or the public generally rates for the transportation of freight upon or over any of the lines so leased or united, in excess of the maximum rates established by law; and (5) for such other relief as may be just.

The defendants have filed an answer and demurrer, and insist that the proceedings should be dismissed for the reasons (1) that there is an adequate remedy at law; (2) that the attorney-general has no authority to institute this proceeding,—that in such case he can only proceed by *quo warranto*, under chapter 240 of the Public Statutes, for a forfeiture of the grant; (3) that the railroad commission, under chapter 155 of the Public Statutes, is the only tribunal given authority to institute a proceeding of this nature; (4) that the state has lost its right to enforce the provisions of the act relating to maximum rates, through laches, acquiescence, and waiver; (5) that no ground is stated for the exercise of the equity powers of the court; (6) that the lines leased by the defendants form parts of interstate routes; (7) that the authority to regulate commerce between the states is exclusively vested in congress, the right of the state in the regulation of rates being limited to intrastate business; (8) that it does not appear but that the increase in rates made by the defendants relates wholly to interstate transportation; (9) that the true construction of the statutes

will not sustain the information, and when so construed, the only effect of the provision as to rates is to inhibit the use of the rights resulting from lease or union to increase them.    At the argument of the cause the state waived its prayer for discovery, and the first question we will consider is the one raised by the ninth objection of the defendants, pertaining to the construction of the statutes upon which the proceeding is founded.

Section 17, chapter 5, of the Laws of 1889, and section 42, chapter 156, of the Public Statutes, are, so far as the questions in this case are concerned, merely reënactments of a part of section 17, chapter 100, of the Laws of 1883.    The authority to lease and unite roads and to establish rates for fares and freights, conferred by chapter 100 of the Laws of 1883, was granted upon the following condition: "Provided, that the rates for fares and freights existing August 1, 1883, shall not be increased on any part of the roads so leased or united, and the decrease in the operating expenses consequent upon the leasing or uniting of any roads shall be met from time to time by a reasonable and just reduction of fares and freights."    There is no divergence of opinion among counsel that in the construction of this act its meaning is to be ascertained from the language used, viewed in the light of the circumstances in which it was passed.    When so viewed, the defendants' contention is that the act does not provide for an establishment of maximum rates; that its only purpose is to inhibit the use of the powers resulting from lease or union to arbitrarily increase rates, and that this is manifest from the provision in the statute, that a "decrease in the operating expenses consequent upon the leasing or uniting of any roads shall be met from time to time by a reasonable and just reduction of fares and freights"; that "provision being made in express terms for a reduction of rates to correspond with anticipated reduced cost of operation under leases or unions, it logically follows, and is plainly implied, that increased cost of operation might be met . . . through an increase of rates."    In other words, that as the last clause in this section of the act expressly provides for a reduction of rates in case a lease or union should result in a decrease of operating expenses, there must by implication be read into the preceding clause a limitation upon the prohibition there stated, restricting its meaning simply to a prohibition against an arbitrary or unreasonable increase of rates, leaving it open to railroads taking the benefits of the act to reasonably increase their rates for any cause.

If this contention is sound, and the act does not provide for a maximum schedule beyond which the rates cannot be raised, then the clause in question would seem to serve no useful purpose;

for the act establishing the board of railroad commissioners, which became a law on the same day as chapter 100, and, as the defendants' counsel contend, was a companion piece of legislation with it, provides that it "shall be the duty of said board to fix tables of maximum charges for the transportation of passengers and freights, . . . and shall change the same from time to time as in the judgment of said board the public good may require." Laws 1883, c. 101, s. 4. If the defendants' construction were to be given the statute, it would be reasonable to suppose that the legislature, having the two measures under consideration at the same time, would have omitted the provision as to rates from chapter 100, and left the question of maximum rates to be regulated by the railroad commissioners, under chapter 101. This, however, they did not do; and a resort to the proceedings of the legislature leading up to the enactment of the law clearly shows that the language used was not intended to convey the meaning which the defendants seek to place upon it. On the contrary, it appears that it was intended to limit the power to increase rates on roads leased or united under the act to the maximums stated in the schedules referred to in section 17. An investigation of the legislation on the subject discloses that in the original bill presented to the legislature, of which chapter 100 is a redraft, the provision in question read as follows: "Provided, that the rates for fares and freights shall not be increased on any part of the road of said new corporation by such leasing or uniting." In the hearings before the railroad committee of the house, when it had this legislation under consideration, the clause "by such leasing or uniting" was objected to by the opponents of the measure, as eliminating from the prohibition all its restrictive qualities. In the redraft of the bill these words were stricken out, and this clause was made to read: "Provided, that the rates for fares and freights existing August 1, 1883, shall not be increased on any part of the road of said new corporation." This provision was enacted in this form, with the single exception that the words "road of said new corporation" were changed to read "roads so leased or united." Under these circumstances, it is not reasonable to suppose that the legislature, by providing for a reduction of fares in case of a decrease in operating expenses due to leasing or uniting, intended to read back into the preceding clause, by way of limitation upon the prohibition there expressly stated, the words which had been previously inserted and stricken out.

Objection is also made by the defendants that the prohibition as to raising rates above those in force August 1, 1883, on roads leased or united under that act, or above those in force July 24, 1889 (when the act of 1889 took effect), as to roads leased or

united under it, or under chapter 156 of the Public Statutes, does not apply to interstate transportation on such roads; that authority to regulate such transportation is by the federal constitution exclusively vested in congress, and that it does not appear but that the rates which the defendants have increased relate wholly to interstate transportation. In the information it is alleged that the defendants "have unlawfully increased the rates for freight on all lines leased or united under each of said acts, beyond the maximum charges therein authorized, and since 1903 have unlawfully demanded and received, and now unlawfully demand and receive, . . . upon all commodities transported over their leased or united lines, rates for freight in excess of the rates authorized and established by law." This appears to be a sufficiently definite allegation that the defendants have raised the freight rates on all commodities, whether of interstate or intrastate shipments; and in view of the defendants' demurrer, the allegation must be taken to be true. The language of the act is also sufficiently broad to cover all classes of freight shipments on railroads located within the state and leased or united under the provisions of the act; and unless it lies in the mouth of the defendants to take the objection that the legislature did not have the power to annex such a condition, as a limitation upon the authority granted, it is to be inferred that the legislature meant what it said, and intended that it should apply to all shipments over roads situated within the state and leased or united under the provisions of its laws, and not otherwise. *Merrill* v. *Railroad*, 63 N. H. 259.

It is to be noted in the discussion of this branch of the case, that the act is not compulsory. It does not require the defendants, or any other railroad corporation, to lease or unite railroads and operate them under its provisions, but simply permits them to do so, and says, if they do, under what terms and conditions they shall exercise the privileges there conferred. This being so, we are not called upon to decide whether the legislature, having the power to grant or withhold the privilege of leasing or uniting railroads within the state, could grant the same upon the conditions named, if by so doing it would infringe upon some provision of the state or federal constitution, and no such question is here considered or decided. The question is: The legislature having granted a privilege which it could have withheld, upon the condition that the rates should not be raised above those specified in the act, and the defendants having accepted its provisions, complied with them for twenty years, and exercised the privileges conferred, including the power of eminent domain and the right to levy tolls, for a still greater period, can they, while continuing to exercise them, be heard to question their constitutionality?

In *Dow* v. *Electric Co.*, 68 N. H. 59, both parties filed petitions under sections 12–19, chapter 142, Public Statutes, for the assessment of damages caused by flowing the plaintiff's land by the defendants' dam. There was a trial by jury and verdict for the plaintiff, who moved that fifty per cent be added to the amount of the verdict, as provided in the act. The defendants objected to this being done, on the ground that the provision of the statute requiring the addition was unconstitutional. But it was held that the defendants could not contest the question. *Carpenter*, J., in delivering the opinion of the court, said: " When a legislative grant of authority to exercise the power of eminent domain contains a condition that the grantee shall pay more than the value of the property taken under the power, the grantee accepting the grant and exercising the power cannot question the constitutionality of the condition. The defendants were authorized to flow the plaintiff's land upon the condition, among others, that they pay the` damages thereby done to him and fifty per cent in addition. P. S., *c.* 142, *ss.* 12–18. The statute is permissive. It confers a privilege which the defendants were at liberty to exercise or not, as they saw fit. But they cannot take and enjoy the benefit without performing the condition on which it is given. By their exercise of the power conferred, flowing the plaintiff's land and applying for an assessment of the damages, they are precluded from denying the validity of the condition. The question of its constitutionality under either the federal or state constitution is not open to them." This case was taken on writ of error to the supreme court of the United States (*Electric Co.* v. *Dow*, 166 U. S. 489), where the judgment of the state court was affirmed. Mr. Justice *Shiras*, in delivering the opinion of the court, said: " We agree with the supreme court of New Hampshire, in thinking that the plaintiff in error, by availing itself of the power conferred by the statute, and joining in a trial for the assessment of the damages, is precluded from denying the validity of that provision which prescribed that fifty per cent shall be added to the amount of the verdict. The act confers a privilege which the plaintiff in error was at liberty to exercise or not as it thought fit. . . . The plaintiff in error accepted the powers and rights conferred by the act of 1868, and joined in the proceedings for the assessment of damages. It must, therefore, be deemed to have agreed that the damages should be assessed in the manner provided for in the act. At all events, the supreme court of the state has so decided; and as its judgment was not based on any federal question, we have no jurisdiction to review it, and the writ of error is accordingly dismissed."

In *Deverson* v. *Railroad*, 58 N. H. 129, *Smith* v. *Fellows*, 58

N. H. 169, *Garland* v. *Towne*, 58 N. H. 187, *Daniels* v. *Lebanon*, 58 N. H. 284, and *Parker* v. *Burns*, 57 N. H. 602, it was held that a party who moves and urges the reference of his cause under section 13, chapter 97, Laws 1874, accepts the provisions of the statute and waives his right to object to the constitutionality of the provision that makes the referee's report evidence upon a jury trial.

In *Dow* v. *Savings Bank*, 59 N. H. 391, the plaintiff, a creditor of the defendant bank, voluntarily submitted his claim to the determination of a commissioner appointed under section 16, chapter 166, General Laws, and it was held that by so doing he waived his right to question the constitutionality of the statute making the decision of the commissioner final.

In *Rand* v. *Company*, 60 N. H. 276, by a statute in force when the action was referred it was provided that, in actions in which the parties should agree to a reference, judgment on the report of the referees should be final and conclusive. Laws 1876, *c.* 35, *s.* 1; Laws 1877, *c.* 20, *s.* 1. It was held that "by agreeing to a reference the plaintiff accepted all the provisions of the statute under which the reference was made, and waived the right of review."

In *State* v. *Corron*, 73 N. H. 434, 445, the same doctrine was invoked as to conditions in a bond given by a licensee under the liquor license law of the state. It was there said: "The right to sell intoxicating liquor is neither a 'natural, essential, and inherent' inalienable right, nor a constitutional one. The state may absolutely forbid or may license such sale. The license, when granted, is not a contract or vested right, but a mere permission which may be revoked at any time. *State* v. *Holmes*, 38 N. H. 225. The manner in which such permission may be recalled, and the consequences attending thereon, are mere limitations upon the privilege. The statute confers a privilege which the citizen is at liberty to accept by becoming a licensee, or not, as he pleases. Having accepted the privilege, he cannot object to any conditions which have been attached thereto by a grantor with power to entirely withhold the privilege."

In *Railroad Comm'r* v. *Railway*, 130 Mich. 248, purchasers at a foreclosure sale of a railroad, located partly in Indiana and partly in Michigan, became incorporated under a statute which limited the fares of railroad companies whose passenger trains earned more than $2,000 per mile to two and one half cents a mile; and in answer to a proceeding, in which it appeared that the road earned more than $2,000 per mile, asking that they be required to reduce their fares to two and one half cents per mile, the defendants replied that such rate of fare was unreasonable and

inadequate. This was admitted by the plaintiff's demurrer to be true; and while it was recognized by the court that the establishment of unreasonable rates by the legislature would be an infringement of the property rights of an existing corporation, within the meaning of the fourteenth amendment to the federal constitution, it was nevertheless held that, as the defendants were incorporated under an act subjecting them to a limitation of two and one half cents per mile, they "will not be heard to question the rates fixed by the statute. They cannot avail themselves of the provisions of the law which give them the right to do business, and disregard those provisions which are onerous." This case was also removed by writ of error to the supreme court of the United States (*Grand Rapids etc. Ry.* v. *Osborn*, 193 U. S. 17), where it was held that inasmuch as the purchasers at the sale under foreclosure "could not demand to be incorporated under the statutes of Michigan as a matter of contract right, . . . they or their privies cannot now be heard to assail the constitutionality of the conditions which were agreed to be performed when the grant by the state was made of the privilege to operate as a corporation the property in question. Having voluntarily accepted the privileges and benefits of the incorporation law of Michigan, the company was bound by the provisions of existing laws regulating rates of fares upon railroads, and it is estopped from repudiating the burdens attached by the statute to the privilege of becoming an incorporated body."

There are numerous decisions in this and other jurisdictions in which the same doctrine has been applied. See: *Deverson* v. *Railroad*, 58 N. H. 129, and cases there cited; *Rockport Water Co.* v. *Rockport*, 161 Mass. 279; *Newburyport Water Co.* v. *Newburyport*, 168 Mass. 541; *S. C.*, 193 U. S. 561, 579; *Commonwealth* v. *Railway*, 187 Mass. 436; *S. C.*, 207 U. S. 79; *Pierce* v. *Railway*, 171 U. S. 641, 645; *Hale* v. *Lewis*, 181 U. S. 473. In accordance with these decisions, our conclusion is, that as the statutes here under consideration were permissive and left it optional with the defendants to accept or reject their provisions, by voluntarily accepting them they took the burdens with the benefits and cannot contest their validity.

It is assumed by the defendants in argument that as the information does not in terms allege that the rates fixed by the statute are reasonable, it must be taken on demurrer that they are unreasonable, and consequently that there is a lack of equity in the bill and that it would be unjust and inequitable to grant the relief asked. This argument, however, overlooks the fact that the information contains an allegation that the maximum rates sought to be enforced were established by the legislature in the enactment of

laws there specifically set out, and that the presumption is that rates so established are reasonable. *State* v. *Railroad*, 69 N. H. 35, 47, 48; *Attorney-General* v. *Railroad*, 160 Mass. 62, 91. The situation, therefore, is the reverse of what the defendants have assumed it to be, and their demurrer must be taken to admit that the rates fixed by the statute are reasonable. It may be added that the maximum rates fixed by the statute being presumed to be reasonable, the defendants, having accepted the benefits of the act, are estopped to show the contrary.

The railroad commissioners are not given exclusive authority to institute proceedings for violating the laws of the state with reference to railroads, and section 15, chapter 155, Public Statutes, does not support the defendants' contention upon this branch of the case. That section simply sets forth the circumstances under which the commissioners are authorized to institute proceedings in their own names and those under which they may require the attorney-general to proceed against railroads for "violating or neglecting to comply with any law of the state in respect to railroads, or with any lawful direction given to them by the board." It does not preclude the attorney-general from proceeding of his own motion whenever he concludes the interests of the public require it. This appears from the wording of the original statute (Laws 1883, *c.* 101, *s.* 5), which was reënacted in the Public Statutes (*c.* 155, *s.* 15) with only a slight verbal change. Comm'rs' Rep. P. S., *c.* 154, *s.* 15. Statutes in other states pertaining to the same subject and similarly worded have received a like construction. Mass. Acts and Resolves 1906, *c.* 463, *s.* 8; *Attorney-General* v. *Railroad*, 197 Mass. 194, 199; *Attorney-General* v. *Railroads*, 35 Wis. 425; *Attorney-General* v. *Railway*, 1 Dr. & Sm. 154; Brice *Ultra Vires* 506–509.

It remains for us to consider whether equity will take jurisdiction of the proceeding and grant the injunction requested. The defendants contend that it will not, for the reason that there is an adequate remedy at law by *quo warranto*, under chapter 240, Public Statutes, for a forfeiture of the grant; that the authority of the attorney-general is limited to such a proceeding, and that the state has lost its right to the relief asked through laches, acquiescence, and waiver.

In *State* v. *Saunders*, 66 N. H. 39, 71, it was held that an information or bill in equity could be maintained to enjoin the use of a building for the illegal sale of spirituous or malt liquor. It is there said that the continuous use of property in violation of public law is a public nuisance, whether a statute declares it to be such or not, if its use does or manifestly will affect injuriously

public rights, though not involving life or health, and that the law of nuisance is applicable to a great variety of wrongs, old and new, having the essential qualities of a nuisance, which may be appropriately dealt with as cases of that class. And it is generally recognized that the attorney-general is the proper party to proceedings in equity to restrain public nuisances and kindred wrongs. *Conn. River Lumber Co.* v. *Company*, 65 N. H. 290, 377 ; *District Attorney* v. *Railroad*, 16 Gray 242, 245 ; *Attorney-General* v. *Railroad*, 27 N. J. Eq., 631, 633 ; cases *infra*.

" The franchise of taking tolls is property. Ever since the act of June 27, 1816 (Laws 1816, *c.* 33), it has been subject to attachment and levy like other property. R. S., *c.* 184, *s.* 13; P. S., *c.* 220, *ss.* 7, 15." *State* v. *Railroad*, 69 N. H. 35, 51. The persistent use of this property or franchise by the defendants in a way prohibited by statute would appear to be "injurious, not only to the immediate patrons of the road, but to every citizen who resides within the scope of its influence,—more or less, in fact, to every property owner in the state." *Ib.* 48. And while such use of property, with its attendant consequences, has been held by courts entitled to the highest respect to constitute a public nuisance or kindred wrong, entitling a court of equity to take jurisdiction and grant an injunction to restrain it (*Attorney-General* v. *Aqueduct*, 133 Mass. 361; *Attorney-General* v. *Railroad*, 197 Mass. 194, 198 ; *Attorney-General* v. *Railroad*, 50 N. J. Eq. 52; *Attorney-General* v. *Railway*, 59 N. J. Eq. 372; *Trust Co.* v. *State*, 109 Ga. 736, 751 ; *Attorney-General* v. *Railroads*, 35 Wis. 425 ; *State* v. *Express Co.*, 80 Neb. 823 ; *United States* v. *Telegraph Co.*, 50 Fed. Rep. 28 ; *S. C.*, 160 U. S. 1 ; *Attorney-General* v. *Railway*, 1 Dr. & Sm. 154 ; *Attorney-General* v. *Railway*, L. R. 3 Ch. 100; *Attorney-General* v. *Cockermouth Board*, L. R. 18 Eq. 172 ; 5 Pom. Eq. Jur. (3d ed.), *s.* 302 ; 2 Mor. Corp., *s.* 1043 ; 2 Cook Corp. (6th ed.), *s.* 635 ; Brice *Ultra Vires* 505–511; 10 Cyc. 1340; 22 Cyc. 718), we do not feel called upon to decide the question, as there is another ground upon which equity may take jurisdiction in this case.

The legislature has authority to use the powers and funds of the state to secure the construction and maintenance of railroads. In this country it has not been customary to establish railroads directly under the supervision and control of the government, but the public benefits to be derived are secured by granting the aid of the state, in the way of franchises and public bounties, to corporations formed for this purpose. The legislature has no authority to grant a public bounty, except in aid of a public purpose. *Perry* v. *Keene*, 56 N. H. 514. Such a grant is therefore always subject to the condition or trust that the corporation shall

assume an obligation to the state to fulfil the purpose of the grant. *State* v. *Railroad*, 69 N. H. 35, 50; *Rogers etc. Works* v. *Railway*, 20 N. J. Eq. 379, 385. The aid may be in the form of a donation of funds, a grant of a monopoly, or a delegation of the power of eminent domain. The trust upon which a railroad receives any of these public bounties is that it will maintain its road as a thoroughfare for the benefit and use of the public upon the payment of reasonable charges. An attempt by the corporation to deprive the public of these benefits would therefore constitute a breach of duties assumed by it in favor of the public; and in the case of a threatened or continuous violation of the trust, equity would be warranted in granting an injunction at the suit of the attorney-general. *Attorney-General* v. *Railway*, 1 Dr. & Sm. 154, 158, 161; 2 Mor. Corp., s. 1043. In this state equity has taken jurisdiction and granted an injunction to restrain a municipal corporation from applying money of the muncipality to illegal or unauthorized uses; and the right to resort thereto for relief has not been restricted to the attorney-general or other state officer, but has been accorded a taxpayer, without his being required to show that he would be injured in a way different from the public in general. *Barr* v. *Deniston*, 19 N. H. 170; *Brown* v. *Marsh*, 21 N. H. 81; *Merrill* v. *Plainfield*, 45 N. H. 126; *Brown* v. *Concord*, 56 N. H. 375, 383; *Blood* v. *Electric Co.*, 68 N. H. 340; *Parker* v. *Concord*, 71 N. H. 468, 472; *Sherburne* v. *Portsmouth*, 72 N. H. 539, 542.

In *Blood* v. *Electric Co., supra, Chase,* J., in speaking of the equitable relief afforded in such cases, said: "In this state, taxpayers have a right to resort to equity to restrain a municipal corporation and its officers from appropriating money raised by taxation to illegal or unauthorized purposes. . . . The remedy is direct, convenient, and adequate, and falls within the rule which entitles parties to the best practical remedy for the redress of their wrongs. The object of such a suit is to enforce a trust lodged with a municipal corporation in behalf of its taxpayers, a matter that is clearly within equity jurisdiction. . . . If there are authorities to the contrary elsewhere, they are not approved."

In *Sherburne* v. *Portsmouth, supra,* it was held that equity had jurisdiction to restrain the city councils of Portsmouth from the commission of an illegal or unauthorized act. *Young,* J., in discussing the ground of equity jurisdiction, said: "It is the policy of the law to subject all persons acting in a trust capacity to the control of the court (P. S., c. 205, s. 1); and the law makes no distinction in this respect between public and private trustees. Dill. Mun. Corp., s. 909. The duty of city councils in administering the ordinary business affairs of the city does not differ from

that of the directors of a private corporation in respect to its business. Such directors act as trustees for their stockholders when they are administering the affairs of the corporation. So city councils act in a trust capacity in administering the ordinary business affairs of the city. *State* v. *Wimpfheimer*, 69 N. H. 166, 169. Since they act in that capacity, they are subject to the control of the court, for in all cases of trust the law gives the court jurisdiction of the subject-matter (P. S. c. 205, s. 1) as well as of the parties; but when they are acting in their legislative capacity, although the court has jurisdiction of the parties it has no jurisdiction of the subject-matter. There is no reason why city councils should be exempt from the rules that govern the conduct of other boards of public officers, or why a person who is threatened with injury on account of their wrongful acts should not have the same remedy to prevent city councils from abusing their trust that there is to prevent other trustees from abusing theirs."

*Brown* v. *Concord*, 56 N. H. 375, 383, was a bill in equity to restrain the city of Concord from paying out money raised by taxation from the city, to defray the expenses of a fire precinct and to maintain water-works, etc.; and it was said by *Ladd*, J.: " I am of opinion that an injunction may and should be granted, according to the prayer of the bill. As to money in its treasury, the city corporation is in the nature of a trustee of the inhabitants of the city, and must apply it to the purpose for which they were incorporated. This furnishes one ground on which a court of equity may interfere. Further: if without fraud the corporation should misappropriate the trust fund, which by the admissions of the answer they propose to do here, it is not plain what remedy at law the taxpayer would have. Upon one or both of these grounds, courts of equity, in this state and elsewhere, have generally taken cognizance of cases of this sort and granted relief by way of injunction to prevent the misapplication by municipal corporations of the corporate funds."

The defendants in this case having taken the franchise to collect tolls and other powers granted to them upon the trust that they would not charge the public for fares and freights more than the reasonable tolls which the legislature had established, and having persisted in the continuous violation of the trust, jurisdiction in equity is undoubted.

In England and in some of the states it is said that the attorney-general has a right to elect his forum, legal or equitable, to restrain corporate violations of charters of public or *quasi*-public corporations, or of other public law; that to deny him such an election is only another way of denying the jurisdiction; that equity admits the remedy at law, but administers its own in preference

when the state seeks it in preference, and proceeds on the presumption that it may better serve the public interest to restrain a corporation than to punish it by penal remedies, or to forfeit its charter. *Attorney-General* v. *Railroads*, 35 Wis. 425, 523, 524; *Attorney-General* v. *Galway*, 1 Molloy 95. We see no reason why an information in equity at the instance of the attorney-general, to restrain a public or *quasi*-public corporation from violating a public trust, should not be entertained independently of a remedy at law.

But if this were not so, it does not seem to us that an information in the nature of *quo warranto* affords an adequate remedy in this case. The unauthorized exercise of power here charged against the defendants is the abuse of the franchise to take tolls, which franchise is of such a nature that its seizure by the state on *quo warranto* proceedings would interfere seriously with the fulfilment by the corporation of the purpose of its creation. The franchise of being a public-service corporation is largely dependent on the franchise to take tolls; and if the latter were taken away the charter would be worse than useless. *People* v. *Turnpike Co.*, 23 Wend. 193, 210. According to the common law of most of the states, if the franchises of a corporation are not dependent upon each other, it is competent for the court in the exercise of its discretion, upon *quo warranto* proceedings, to decree a forfeiture of the misused franchise and leave the corporation intact. *State* v. *Barron*, 57 N. H. 498; *S. C.*, 58 N. H. 370; *State* v. *Bridge Co.*, 85 Me. 17, 33; *State* v. *Canal Co.*, 23 Ohio St. 121; *State* v. *Association*, 35 Ohio St. 258, 264; *State* v. *Association*, 42 Ohio St. 579, 584; *State* v. *Gas Co.*, 153 Ind. 483, 491; *Marion Bond Co.* v. *Rubber Co.*, 160 Ind. 558, 561; *State* v. *Railway*, 36 Minn. 246. Our statute (P. S., *c.* 240, *ss.* 9, 10, 11), though in some respects more comprehensive, is largely confirmatory of the discretionary power exercised by the court at common law. But under this statute the only judgments that can be rendered are that the franchise be or be not forfeited. P. S., *c.* 240, *ss.* 10, 11. A judgment that the franchise to take tolls should not be forfeited would not afford adequate redress in this case; it would leave the defendants to continue in their violation of the law. And while a judgment of forfeiture would put an end to the abuse or misuse of the franchise, it would also put an end to the collection of such tolls as the charter authorizes, and in all probability would bring about an abandonment of the policy of railroad consolidation inaugurated in 1883. As the relief afforded by *quo warranto* would be of far too grave consequences to the defendants or of no benefit to the state, depending upon the judgment rendered, it cannot be said to be adequate in the sense that it should preclude

the state from availing itself "of the superior efficacy and completeness of the remedy afforded in equity." *Trust Co.* v. *State*, 109 Ga. 736, 747.

The argument that the state is guilty of laches, and that on this account equity will not enforce its claim for relief, is without foundation when the facts are considered. The state is not seeking relief against the unauthorized and illegal collection of freight rates by the defendants back in 1903, but against their collecting them at the time the information was filed and continuing to do so in the future. The groundwork of the state's claim is that the defendants at the time of filing the information had demanded and received, and were persisting in demanding and receiving, unauthorized and illegal freight rates. If the state were seeking equitable relief as to acts done five years ago, its delay in instituting proceedings for such a length of time might be regarded as laches precluding it from relief. But that is not the situation, for here the state is seeking to enforce its right against the present and future prosecution of acts wholly unauthorized. *Parker* v. *Concord*, 71 N. H. 468, 472.

What is true in regard to the contention as to laches is equally true as to acquiescence and waiver. Nothing has been called to our attention from which it can be said that the state has acquiesced in the defendants' continued violation of public law and public duty, or waived its right to object thereto. The statute which the defendants are charged with violating has not been repealed, and nothing short of the passage of an act by the legislature, either expressly or by implication repealing it, could preclude the state from insisting upon its enforcement in respect to present or future acts. *People* v. *Phœnix Bank*, 24 Wend. 431, 433; *People* v. *Company*, 27 Barb. 445, 453, 458; *State* v. *Railway*, 36 Minn. 246, 259. The order is, demurrer overruled.

*Case discharged.*

All concurred.